20-2518 from the District of Minnesota, Brian Forrest et al versus Polaris Industries et al. Very well Mr. Tangren, we'll hear from you first. Good afternoon and may it please the court. My name is John Tangren and I represent the plaintiffs who each bought recreational off-road vehicles from Polaris. As plaintiff's complaint alleges in detail, these vehicles are excessive and unsafe. These extremely high temperatures not only create a risk that the vehicles could spontaneously catch fire, but also cause components in the vehicles to prematurely degrade from day one. Plaintiff's allegations are supported by, among other things, plaintiff's own expert testing, which is extraordinary in the pre-complaint phase, and Polaris's own admissions of excessive heat in the vehicles. Despite these allegations, the district court dismissed each of plaintiff's claims, finding that plaintiffs did not have standing under Article 3. This ruling cannot be reconciled with this court's precedent, particularly its 2011 ruling in Zernpex, which presented the same kind of defect as in this case, a defective product that begins to degrade immediately upon use. For these reasons, the district court's ruling should be reversed. In purchasing the defective Polaris vehicles, plaintiffs indeed suffered an injury in fact that was both particularized and actual and that confer standing under Article 3 to seek redress in the federal courts. Each plaintiff suffered a particularized injury because they overpaid for a vehicle that suffered from the excessive heat defect. The allegations here are on all cores with those in Zernpex. In both cases, there was a defect in a product line that caused those products to begin to degrade immediately upon first use. As Judge Ullman may particularly recall, Zernpex concerned a line of plumbing fittings that began to corrode immediately upon being put into service. Similarly here, this case concerns Polaris vehicles that begin to degrade immediately upon their first use. Where's the best allegation in the complaint that there has been degradation already? Well, first of all, each plaintiff alleges in their individual plaintiff section that their class vehicle generates excessive heat due to the excessive heat defect. In a couple of cases, the plaintiff felt comfortable enough to say that they could feel that excessive heat coming through the passenger compartment. I'm familiar with those allegations, but that wasn't the point you were making. You were making the point that there's immediate degradation of parts in the vehicle, I thought. Is that alleged or not? That allegation goes hand in hand with the complaint's later discussion from the technical literature that explains how excessive heat causes plastic components to degrade, and then goes further to detail the connections between that degradation and the kinds of problems that keep popping up in Polaris's recall. Which paragraph do you cite for an allegation that there has already been degradation? The discussion of the technical 43 at paragraph 180. The district court, instead of Zernpex, relied on this court's decision and Wallace v. ConAgra Foods, but Wallace can and should be distinguished. In that case, plaintiffs were unable to determine and did not allege whether the hot dogs they purchased were actually subject to the same non-kosher defects that they allege for other hot dogs. Here, plaintiff's complaint clearly establishes the defect in each of their vehicles. The crux of the district court's error can be summed up in its finding on page six of its opinion that the vehicles they purchased ever overheated. In fact, plaintiff's complaint is replete with allegations that establish exactly that. In addition to the ones that I already discussed in response to Judge Colleton's question, the complaint also explains in detail the defective engine configuration that allows excessive heat to build up inside the vehicle. It describes the It quotes the admissions from Polaris of excessive heat, including its CEO's apology for all of the systemic thermal risks in these vehicles. The complaint discusses plaintiff's preliminary expert testing that showed that the class vehicles run much hotter than its competitor vehicles. The complaint shows competitor vehicle designs that do allow for adequate airflow to avoid excessive heat, unlike Polaris's design. The complaint described aftermarket sellers warning about excessive heat in Polaris vehicles. And finally, the complaint discusses incidents in which the excessive heat led to the Polaris vehicles actually catching fire. Plaintiffs have also alleged that they've suffered... Just so I'm clear, when you refer to the complaint, are you referring to an amended complaint that's at document number 70? That's correct. Okay, the paragraph numbers and pages you cited earlier don't match that document. I apologize. I think I was citing the pages for the appendix. Well, that doesn't help me. My copy of the appendix... What paragraph of the complaint are you relying on for the claim that there has already been degradation? We're relying on the paragraphs in the complaint in which each plaintiff alleges that their vehicle is subject to excessive heat and the allegations that that excessive heat necessarily results in premature degradation. Unfortunately, we don't have the benefit of discovery from Polaris. Right. I just thought you might point me to a paragraph or two that you thought I should focus on because it's a 199-page complaint. But if you can't do it, I'll soldier my way through. I just thought you might want to focus us on some allegations since the defense seems to argue you didn't allege that there had been degradation. I think that the best section for that purpose would be the one that begins on page 41 of the complaint. That lays out at a more scientific level what is actually happening to the plastic components of the vehicle when they're exposed to excessive heat. The part that Polaris vehicles give off excessive heat and then it goes through the aftermarket products and so forth. Alternative designs. That's what's on page 41. I will get a corrected citation for that, your honor. I think I may have cited the wrong paragraph in my outline here. So I will make sure to do that on rebuttal. I'm just wondering, I guess, if it's true that the heat immediately causes degradation, wouldn't it have been a simple matter just to say for each of these plaintiffs that we've looked in the back of our vehicle and this or that part is melted already? Unfortunately, it's not that simple because the degradation occurs at the microscopic level. You can't always see a melted part. What you see instead is, for example, there was a recall where the vehicle was noted to have a fuel line that was consistently kinking and failing and causing leaks of the fuel. Our complaint explains how that is a natural consequence of the thermal degradation we're alleging. I see. The plaintiffs have also alleged an actual injury here due to the economic loss they've suffered. And it's clear from this court's opinions in the Enterprise Financial Group case from 2019 and the Coons v. Scott trade case in 2017 that that economic loss qualifies as an actual injury for standing purposes. The district court's requirement that the vehicles actually catch fire conflicts with precedent in this circuit and other circuits. We've discussed Zirimpax and here it's, I just want to revisit that point to note that this is not a case like O'Neill or Wallace where the product performed entirely to plaintiff satisfaction. Here the plaintiffs have alleged that Polaris vehicles began to generate excessive heat from the first use, which caused vehicle components to prematurely degrade. Thus this case falls squarely on the Zirimpax side of the line that those three cases draw. Further, a finding that plaintiffs lack standing in this case would set this circuit in opposition to every other circuit that has considered the question of whether plaintiffs have standing to recover an overpayment for a defective product, even if the plaintiffs have not suffered the most serious consequences of that defect. The fifth circuit in Cole found that airbags do not need to unexpectedly deploy in order for plaintiffs to have standing. The sixth circuit in the Whirlpool case held that even owners who have not experienced a mold problem in their washers could be included in the class. The seventh circuit's decision in Aquedots held that the children did not actually need to swallow the toxic beads at issue for the plaintiffs to recover. And finally the ninth circuit's decision in Maza held that a defect in the collision avoidance system need not manifest in order for the plaintiffs to have standing. I'll conclude my opening presentation by noting that standing for plaintiffs as well as for the classes they seek to represent under these circumstances is essential not only to prevent consumers from being economically defrauded, but also to deter the manufacture and sale of products that endanger public safety. Unless the court has any further questions at this time, I will reserve the balance of my time for rebuttal. Very well, Mr. Tangren, thank you for your argument. You can mute yourself for the opposing side's argument and we'll hear from Mr. Bloomer. You may proceed. Thank you, your honor. May it please the court, Andrew Bloomer on behalf of Polaris. Let me just begin by saying it's a privilege to argue before you in this matter. Your honors, Judge Wright got it exactly right. She carefully reviewed plaintiff's allegations twice, including after giving them leave to amend their complaint. She applied this court's well settled precedents and she properly held that the seven plaintiffs at issue, that is plaintiffs Bruner, Lentz, Zeke, Behrens, Jacks, Forrest, and Beatty lacked article three standing to sue. The district court we submit should be affirmed for four fundamental reasons. First, these seven plaintiffs did not allege any facts showing that an alleged excessive heat defect manifested itself in their own vehicles. They did not allege that their own vehicles ever malfunctioned, overheated, melted, had any parts degrade or replaced, have had a shorter service life or otherwise failed to perform as intended despite owning those vehicles for anywhere from three to five years. Nor did these plaintiffs allege that they have stopped driving their vehicles or that they drive them less because of alleged heat. Judge Colleton, you asked about any allegations of degradation. For these seven plaintiffs, we submit that you can search the entire complaint, whether it's paragraphs 168 to 180 or the paragraphs beginning on page 41, you will not find any allegation, certainly not any factual content showing that the vehicles of these seven plaintiffs have in fact suffered any kind of degradation. And these vehicles, your honor, were within the they hired an alleged expert to what they call test some vehicles, but they didn't have them test their own vehicles, which would have been easy enough. So this complaint is bereft of any allegation of degradation backed by any allegation of fact with regard to these seven plaintiffs. What about this idea that it happens at a microscopic level according to this expert and apparently is not perceptible? I'm not sure that's their expert, your honor, as opposed to the technical literature that they rely on. Excuse me, technical literature that says that. Yeah, well, the technical literature describes general concepts, including that, quote, all materials are expected to experience some level of thermal degradation, unquote. That's supplemental appendix three and seven. But that doesn't help the plaintiffs that this is not technical literature that addresses off road vehicles, let alone Polaris vehicles. It's a generalized statement that's unconnected to any analysis of these plaintiffs vehicles. What's remarkable about the plaintiff's briefing, your honors, as well as their arguments in this court, is that they say almost nothing about the seven plaintiffs whose claims are actually at issue. Those allegations for these plaintiffs are found at paragraphs, at complaint paragraphs 22 to 27, 40 to 45, 46 to 51, 64 to 69, 70 to 75, 88 to 93, and 101 to 106. And there is no allegation of physical damage, malfunction, or failure of any kind. Why is that important? Your honors, the plaintiff's complaint originally had 14 plaintiffs alleged. Seven of those plaintiffs alleged a thermal event or a fire, and thus they could demonstrate standing. We did not move against those plaintiffs on Article III grounds. Interestingly, the plaintiffs voluntarily dismissed those plaintiffs who could demonstrate standing so they could take an appeal of the claims of the seven plaintiffs at issue here. So what the plaintiffs did in their complaint is that they mixed together individuals who have no standing with individuals who clearly did and clearly alleged it, and Spokio teaches us that a plaintiff must clearly set forth facts supporting each element of Article III standing. But standing, as Judge Wright realized, requires a review of each plaintiff's allegations, and the seven plaintiffs on this appeal failed to allege facts showing that an alleged defect has manifested in their vehicles. And this court's precedents, including Wallace, Inouye Zernpex, O'Neill v. Simplicity, and Briel, all hold that in the it is not enough for a plaintiff to allege that a product line contains a defect or that a product is at risk for manifesting this defect. Rather, the plaintiffs must allege that their product actually exhibited the alleged defects. That's Wallace at 747 F3rd at page 1030. What do you do with a case, though, where a product has a risk of some dramatic calamity, like a major fire or something else that would cause death? How do you avoid a rule that says the plaintiff has to undergo the calamity before the plaintiff has any standing, or do you think that's the correct rule? I don't think they have to undergo any calamity, but I do think they need to demonstrate some malfunction or problem. And I know, Your Honor, Judge Colleton, you were on the panel in the O'Neill v. Simplicity case. Judge Wollman authored the O'Neill decision and was on the particularly from O'Neill and Briel, is they make clear that defect manifestation requires at a minimum that the product experienced a malfunction or otherwise fail. That's O'Neill at 574 F3rd at 504 and Briel at 172 F3rd at 628. Even Zernpex, which had expert testimony of had an allegation that the stress corrosion cracking afflicted all of the pipes. Here we have a complaint where the alleged defect is claimed to have affected some vehicles, but not others. And I think to answer your question squarely, Your Honor, O'Neill involved dropside kids that had caused injuries and maybe even deaths of infants. Briel involved an anti-lock braking system that was alleged to be defective. We have cited in our case, in our brief, several automotive cases that allege serious defects. But in those cases, courts can and do require some issue to manifest itself in the plaintiff's product, because otherwise, as in O'Neill, as in Briel, this court has held repeatedly, the plaintiffs received the benefit of their bargain. And in this case, it's not the case that Judge Wright required the plaintiffs to have a vehicle fire. Her opinion at addendum six makes clear that these seven plaintiffs do not allege that their particular vehicle malfunctioned in any way and do not allege any facts as to how the alleged defect manifests in their respective cases. And for that reason, she found they failed to establish article three standing, and we submit that is entirely correct. So counsel, in the case of a defective design, for example, an airbag, what sort of manifestation would you need to show in a case with those facts? I know there are airbag cases, Your Honor. I believe we actually cited a few of them in our briefs, and I can try to find them. I am not an expert in airbag deployment or non-deployment, so I don't know if it would be something like a warning light. I do have some experience in the GM ignition switch litigation, Judge Kobes, where there was one particular recall where a warning light would go on, signifying some issue with the vehicle. And that issue was eventually the subject of a recall, a NHTSA recall. So I think that what the plaintiffs need to do is they don't have to show the worst possible event. The worst possible event, of course, there's remedies for in tort and personal injury, but they do need to show, particularly whether they're otherwise alleging a pure economic loss, that somehow the vehicle malfunctioned. Because if it doesn't, they've got the benefit of their bargain. They got a vehicle, like these seven plaintiffs here, who've had it from anywhere from three to five years, that have performed as they should, and they've got the benefit of the bargain from those vehicles. We know from the defect that there's a heightened risk that this is going to go bad on us and cause a fire, and therefore we can't use it. We're not willing to use it because we don't want to take the risk. Would that be sufficient? I actually don't think it would be sufficient under this court's precedence, Your Honor, but we don't have that allegation here. We don't have an allegation. I know, I'm just worried about the rule you're advocating for. It sounds like if you buy a vehicle, you don't have standing until you come up with the one where it doesn't work. And is that really the right rule of law? I think the rule that this court has established is that there has to be some manifestation of a defect or problem with the product to have a legal claim, particularly in the absence of a personal injury, which the plaintiffs are not claiming here. I don't know, Mr. Bohlberg. I have a 2011 Honda Pilot that I couldn't permit my wife to sit in the passenger seat for several years because of a defective airbag. I think the manufacturer finally went bankrupt. How much of a risk do we have to take? We poor consumers. I think, Judge Wolman, it's a very good point. I think that- Why shouldn't we err? If we're going to err, let's err on the side of the public safety. I mean, both you and your opponent, counsel, are too young to remember Ralph Nader and the Corvair cases, unsafe at any speed. Unsafe at any speed. Correct, Your Honor. Are these Polaris things unsafe at any type of operation? No, Your Honor. In other words, I'll go back to Judge Calton, how many people have to be burned or how many dogs have to bite before they're considered a hazard? Not at all, Your Honor. And the plaintiffs who do have a manifestation or some issue have a remedy. The plaintiffs under this court's precedence that do not allege any fact showing a problem with their vehicle, and this court has made clear that the mere risk of a product line defect, and that goes from Braille through O'Neill to Zernpex to Wallace, that the mere risk is not sufficient. It's not sufficient to create a legally cognizable injury. They might be able to allege facts showing that the value of vehicles has gone down  some facts to demonstrate that this alleged defect caused them to overpay for vehicles. There's no allegations like that for these plaintiffs or for even the plaintiffs who alleged a thermal event in their vehicles. But there needs to be some allegations that would show either for economic loss or for or otherwise a problem or issue with the vehicle. Otherwise, they have a vehicle that performs as intended. And I think what I would say, Your Honors, is that the plaintiffs have kind of conceded the fundamental problem with their pleading. On page nine of their reply brief, the plaintiffs say the following. Polaris cannot cite an opinion from any other circuit in which a court held that a plaintiff lacks standing when, and here's the key language on page nine, they alleged they purchased a normal use of that product. Two notable things about that statement. One, it's not accurate. We cited the Birdsong case from the Ninth Circuit, Rivera from the Fifth Circuit, Johnson and Johnson-Talcum powder products marketing litigation from the Third Circuit, all of which are Article III cases. But more importantly, Your Honor, the plaintiffs' concession that what they have alleged in this complaint, in this case, is that they purchased a defective product that had the potential to interfere with their normal use of that product, is squarely rejected by Wallace, Zernpex, O'Neill, and Briel. And that's the problem these plaintiffs have. I would also add, Your Honors, that in terms of testing, four of these plaintiffs have general vehicles, not RZR or Ranger vehicles. So four out of the seven have a Ranger vehicle. That vehicle was never tested by the plaintiffs. Another one has a general vehicle. That vehicle was never tested by the plaintiffs. And then the two who actually own RZR or Razor vehicles, the plaintiffs never tested their, the model year or model of those vehicles, even though they obviously had them in their possession, custody, and control. Finally, Your Honors. Oh, I'm sorry. I see my time is up. Let me ask you one more question, though. Are you familiar with the Seventh Circuit opinion in the Aquedot's case involving the beads? I am, Your Honor. Where the court says that the plaintiff's loss there was financial, they paid more for the toys than they would have had they known of the risks that the beads pose to children. Do you think that holding conflicts with our circuit law? Or do you think that that can be reconciled with O'Neill and Wallace and so forth? I think the way it's written, there's arguably a conflict. I think Judge Easterbrook in that decision did not have the benefit of the Supreme Court's decision in Clapper where the court addressed alleged economic losses. I do think that it's a fairly cursory treatment of the issue in the Aquedot's decision. And I think that kind of reasoning has been criticized in other courts because what it would do and what I do think would contravene this court's precedent, as well as Supreme Court precedent, is it would mean that a plaintiff can establish standing by alleging, I purchased a product that I paid more for, and I should have paid less, or I wouldn't have purchased at all, even though the product performs as intended and never manufactures an issue. I think if Aquedot's means that, that would be a conflict with this circuit's precedent. I also think it would conflict with the Supreme Court's decision in Clapper because it would allow standing to be manufactured based on an allegation that is entirely separated and divorced and untethered from how the product actually performed. All right. Thank you for your argument. Thank you, Your Honor. We would ask for the court to affirm Judge Wright's decision below. Very well. Mr. Tangren, we'll hear from you in rebuttal. You'll have to turn your microphone on first. I apologize. Very good. I'll start with referring the court to paragraph 162 of the complaint, which is on paragraph, or I'm sorry, on page 52 of the complaint. My apologies for the incorrect page reference earlier. In this paragraph, plaintiffs allege that in excessive heat conditions, thermal degradation of plastic components is inevitable. It often occurs microscopically within the plastic, and thus vehicle owners are unaware their vehicle components are degrading, reducing their service life, and making them vulnerable to failure. And I think that paragraph is probably the cleanest allegation of the court's history. That excessive heat actually does lead to thermal degradation, although I would also recommend that section going on to paragraph 180 for more background on that. But what this paragraph really puts into relief is that requiring plaintiffs to undertake expensive testing of their vehicles at the microscopic level, which is apparently the only thing that would satisfy Blairs in the district court here, despite there being overwhelming evidence of a design defect affecting all the vehicles in its line, is a step that Rule 12 simply doesn't require. It would take us well beyond the plausibility standard that Twombly and Iqbal establish, and instead require an evidentiary showing that is incompatible with any notion of notice pleading. It's sometimes cliche to invoke the Ford Pinto cars in cases like these, but here it's not an exaggeration to say that the vehicles could literally catch fire, and in fact did catch fire for several of plaintiffs, co-plaintiffs, and requiring that the vehicles catch fire before plaintiffs can bring suit simply offends common sense. Polaris's counsel invoked his experience in the GM ignition matter, which is an excellent example of how the kind of defect that issue here should confer standing. In fact, in that case, Judge Furman, after reviewing a number of cases involving manifestation cited from both sides, eventually concluded that a requirement of manifestation for standing or otherwise, in most cases, appears to be serving as essentially a proxy for whether or not there's a defect in the first place. And we see this in a number of the cases on which Polaris and the district court relied on as well. In O'Neill, where the cribs performed satisfactorily, it really did call into question whether there was a design defect that affected all of the cribs, or whether in those cribs that malfunctioned, there may have been something else at play, like sleep-deprived parents putting on the drop side upside down, which is apparently what was happening in some cases. You know, in Wallace, it was apparently the case. Well, hold on a second on O'Neill, though. There is a paragraph in there that says it's not enough to allege that the product line contains a defect or that a product is at risk for manifesting the defect. Rather, the plaintiffs have to allege the product actually exhibited the alleged defect. Does that mean that risk is not enough? That the risk that the crib could have separated was there, but it wasn't enough until it actually did separate? Well, again, I think that O'Neill's requirement that the crib separate rests on skepticism of whether there's actually a defect there. And again, that's not our case. We're not just talking about a risk of fire. We're talking about...  That was in the record below in O'Neill, not in the opinion that was issued by this court. But this is a way in which O'Neill could and perhaps should be reconciled with a number of the cases that otherwise do allow for a mere risk of manifestation to suffice for standing. I mean, the O'Neill plaintiffs even allege they couldn't use their crib anymore, which arguably is a stronger allegation than your people have made because your people apparently are still using the vehicles. Not in all cases, but the problem with O'Neill is that they had nothing to point to in the crib to say, and this is how the crib is not working the way we want it to. This is the degradation that we're seeing in the Polaris vehicles that give rise to standing here. And so, I see my time has expired, so if the court has no other questions... I have one other thing, if my colleagues won't be bothered too much by my extending the time, but Mr. Bloomer brought up this unusual procedural history where he didn't explain it all, but as I understand it, you sought certification under Rule 54B and then under 1292 to appeal this standing order and the district court denied it, so then you dismissed without prejudice your so-called fire plaintiffs in order to create a final judgment. You know, we've got a lot of cases that frown on what we've called manufacturing finality. They mostly have to do with plaintiffs who dismiss ancillary claims without prejudice in an effort to appeal a principal claim that was dismissed and preserve the right to then refile the ancillary claims, and we've said in some cases we're not going to allow that. Is there a jurisdictional problem here based on this idea of manufactured finality? Are we dealing with a situation where if you prevail, the fire plaintiffs are just going to action on remand and you've circumvented the final decision rule? There's no jurisdictional problem because the plaintiffs who did experience fires did clean and total dismissals. Obviously, we were hoping for a better result. We believe that both certification under Rule 54B and 1292 would have been appropriate. What do you mean by clean and total? I thought it was without prejudice so they could refile. They could refile elsewhere, but I mean there were no claims left below, unlike some of the ancillary claims being dismissed in some of the other cases you referenced. It was a difficult decision for them. Those cases, the dismissal that I'm talking about resulted in those claims being left below. That was the whole point. The plaintiffs dismissed claim number one. The plaintiffs dismissed claim number two without prejudice, thinking that if they can win on appeal with respect to claim one, then they'll amend on remand and bring claim two back again. I'm just wondering if you're up to the same thing where if you win here, the fire plaintiffs are just going to rejoin the action. The fire plaintiffs left no claims below and it was a difficult decision for them, but ultimately we thought that it was best to allow this issue to be appealed so that there were no issues down the road. For example, at class certification, if we had a class where some class members did experience fires and some did not. I'm not sure what you mean by they left no claims below. Are you saying that they're somehow precluded from rejoining the action on remand? No, but there are no live claims unlike the cases that you were referring to earlier. Yeah, there were no live claims there either. They were dismissed without prejudice. I see. I see. And so it's that strategy here that if you win in this appeal, then the fire plaintiffs can just rejoin the action and we'll be back to the same complaint that was pending before. And should we of the final decision rule? I don't see that that would be an issue because of the nature of what's here on appeal, whether or not plaintiffs who don't have a manifestation of fire in their vehicles have standing. That wouldn't put into question at all the claims of the fire plaintiffs for which Bellaire's never challenged that. I agree it wouldn't put into question their claims. I'm just wondering if it anyway, I'm repeating myself. I appreciate your responding to those questions. Unless there are other questions from my colleagues, I think we'll thank you both for your arguments. The case is submitted and the court will file an opinion in due course.